Filed 6/17/14  P. v. Recarte CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>XAVIER RECARTE et al.,<br><br>    Defendants and Appellants. | B245867<br><br>(Los Angeles County<br>Super. Ct. No. VA106973) |


        APPEALS from a judgment of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Affirmed.

        Fay Arfa, under appointment by the Court of Appeal, for Defendant and Appellant Xavier Recarte.

        H. Russell Halpern, under appointment by the Court of Appeal, for Defendant and Appellant Miguel Vasquez.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Shawn McGahey Webb and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted appellants Miguel Vasquez and Xavier Recarte of two counts of murder—Vasquez of first degree, Recarte of second degree (Pen. Code, §187, subd. (a))—and found the crimes were committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(c)).[1]  As to Vasquez, as to counts 1 and 2 the jury found true three special circumstance allegations under section 190.2, subdivision (a)(3), (21), and (22) (multiple murders, murder by discharging a firearm from a motor vehicle, and gang murder), and the allegation that he discharged a firearm causing death (§ 12022.53, subds. (d) & (e)(1)).  As to Recarte, regarding counts 1 and 2, the jury found not true the special circumstance allegations and discharge of a firearm allegations.  As to a third count of shooting at an unoccupied building (§ 247, subd. (b)), the jury found Vasquez guilty of the lesser included offense of grossly negligent discharge of a firearm (§ 246.3) with a gang allegation (§ 186.22, subd. (b)(1)(c)); the jury found Recarte not guilty of any crime as to count 3.

The trial court sentenced Vasquez on each first degree murder count to consecutive terms of life in prison without the possibility of parole, plus 25 years to life for the discharge of a firearm causing death allegation.  (§ 12022.53, subds. (d) & (e)(1).)  The court imposed the midterm of three years on count 3, plus a consecutive term of three years under section 186.22, subdivision (b)(1).  The court imposed and stayed the additional firearm use enhancements.  (§ 12022.53, subds. (b) & (c).)  The court sentenced Recarte to consecutive indeterminate terms of 20 years to life, for a total term of 40 years to life in state prison.

Appellants appeal from the judgments of conviction raising numerous claims of error, none of which is persuasive.

---

[1]     All undesignated section references are to the Penal Code.

2

# FACTUAL BACKGROUND

## I.     The Killings

On August 12, 2008, near 88th Street and Bandera in Los Angeles, Travelle Hamblett and Markeith Wilson, both African American, were shot in a hail of bullets. Hamblett died at the scene. Wilson died a few days later in the hospital. From the placement of the fatal bullets, both were shot from behind and were not facing the shooter when wounded.

The shooting occurred in the heart of territory claimed by the Nine Deuce Bishops, a Crips affiliated, African American gang. Wilson belonged to the Nine Deuce Bishops; Hamblett's gang affiliation, if any, was unknown. Appellants belonged to Florencia 13, a Hispanic gang: Recarte to the Neighborhood clique of the gang, Vasquez to the Jokers' clique. Florencia 13 was a rival of the Nine Deuce Bishops.

Alsovon Jenkins witnessed the shooting. At trial, he denied having any knowledge of the incident, and did not want to be involved in the case. He was impeached by pretrial statements he made in a recorded 911 call and in a recorded interview with Los Angeles County Sheriff's Detective Richard Ramirez. According to this evidence, Jenkins saw Hamblett and Wilson walking in an alley shortly before the shooting. While Jenkins was working under the hood of his van on 92nd Street, between 88th and Bandera, he heard gunfire, looked up, and saw a gun shooting from a green Thunderbird with two Hispanic occupants. Jenkins heard as many as 15 shots. As the Thunderbird drove off, Jenkins followed it in another car. He called 911, described the Thunderbird's route of travel, and gave the Thunderbird's license plate number, 3JSV491. Jenkins saw the Thunderbird stopped on 75th Street just west of Compton Avenue. The passenger got out holding a gun, and entered a house. The driver drove off.

A sheriff's helicopter tracked the Thunderbird's route, and Sheriff's Detective Frank Heredia participated in stopping the car shortly before noon. Appellant Recarte, the driver, was the sole occupant (his fingerprint was later discovered on the driver's seat belt buckle). Two shell casings were discovered inside the car, on the rear passenger

3

floorboard, and one was found outside on a windshield wiper. Deputy Heredia administered a gunshot residue test on Recarte's hands which, when analyzed, returned positive for residue.

Sometime after 11:30 on the day of the shooting, appellant Vasquez's cousin, Marcos Rangel, was outside his mother's residence, a converted garage at 1435 East 75th Street, near where Jenkins had seen the passenger exit the Thunderbird. Appellant Vasquez lived in the back house on the property (the converted garage was to the rear of that house). Appellant Vasquez spoke to Rangel through Vasquez's kitchen window. At trial, Rangel denied that Vasquez told him anything other than not to go outside because the police had blocked off the street. Rangel was impeached by recorded statements he made in an interview with Detective Ramirez. In that interview, he told Detective Ramirez that appellant said that "he gunned — that they gunned down three people," and that Vasquez was "with the people" at the shooting, though he "never said who was the shooter." Vasquez described the victims as "chongos," a derogatory term for African Americans. According to Rangel, Vasquez was known as "Trucha" from Florencia 13.

Around 1:00 p.m., Detective Steven Keen collected a scent sample from the Thunderbird for use by a scent dog. Detective Keen went with the scent dog and its handler, Edward Hamm, to 1435 East 75th Street (where appellant Vasquez lived in the back residence, and Marcos Rangel's mother lived in the converted garage). The dog alerted on the sidewalk at the driveway. The dog then led them down the driveway, past the front house, to the front door of the back residence. Detective Keen knocked on the door. Hilda Vasquez, appellant's mother, answered the door. Detective Keen observed appellant Vasquez lying on the couch inside. He also saw Marcos Rangel exit the converted garage. Both appellant Vasquez and Marcos Rangel were arrested.

Rangel was ultimately released. But before he was released, in a tape-recorded conversation with another inmate while in custody, he said that the "fool [who] had shot them fools was [his] cousin," who was known as "Trucha" from "Jokers."

Without their knowledge, appellants Vasquez and Recarte were recorded speaking to each other while incarcerated in separate holding cells. Four times Recarte asked

4

Vasquez, who had trouble hearing him, "Did you tell them that I told you to bust?" Ultimately Vasquez repeated the question, "That I told you to bust? . . . To shoot?" Recarte said, "Yeah." Vasquez replied, "Hell no," and said, "I'm like, damn. I don't even know him." Recarte warned Vasquez not to say anything, and Vasquez said, "I told you, I don't know you." Recarte replied, "That's right. Keep it like that, homie." Vasquez said, "Say it, Florence, I'm Florence gang, nigger." Recarte replied, "Right." Vasquez said, "You don't know me, I don't know you, dude."

Later in the conversation, Vasquez referred to the police discovering him "[t]hat same day" at his residence: "This isn't a joke, homie. How the fuck did they creep up to me, though?" Still later, Recarte told Vasquez, "We should've waited the other day. . . . We should've waited dawg." Vasquez replied, "I know, dude, we fucked up."

On the day of the shooting, a Sheriff's firearms expert, Robert Keil, found 13 nine-millimeter shell casings in the street at the scene. They were grouped together, indicating that the vehicle from which the shots were fired was either stopped or moving slowly. Keil determined that the 13 shell casings found in the street and the three seized from the Thunderbird driven by appellant Recarte were all fired from the same nine-millimeter firearm.

## II.    Gang Evidence

Los Angeles County Sheriff's Detective Dean Camarillo, who had 16 years experience investigating the Florencia 13 gang, testified as the prosecution gang expert. Detective Camarillo knew both appellants, each of whom had told him that they belonged to Florencia 13. Recarte, who had "Trece" (Spanish for 13) tattooed on his arm, said he belonged to the Neighborhood clique. Vasquez said that he belonged to the Jokers clique. According to Detective Camarillo, it was not uncommon for members of the Neighborhood and Jokers cliques to associate with each other.

Detective Camarillo described "[s]ome of the primary activities [of Florencia 13 to be] assaults, including those with firearms such as drive-by shootings, possession and distribution and sales of narcotics, robberies, . . . murder, and illegal possession of

5

firearms . . . ." He had personally investigated cases involving some of these crimes committed by Florencia 13 members. In one case, Florencia 13 member Richard Hernandez pled no contest to possession of a firearm by a felon (former § 12021, subd. (a)(1)), the crime occurring on March 23, 2007. In another, Florencia 13 member Ernesto Orozco was convicted of three counts of aggravated assault (§ 245) committed on January 20, 2007.

Asked a hypothetical question based on the evidence of the shooting in this case, Detective Camarillo testified that it was committed for the benefit of the Florencia 13 gang. The fact that in midday two Florencia 13 members would travel to territory claimed by the rival Nine Deuce Bishops and kill two people by firing 16 rounds "sends a strong message to the community . . . [,] the [Nine] Deuce Bishops . . . [and] other gangs." The crime instills fear and enhances Florencia 13's reputation. Regardless of whether only one victim belonged to the Nine Deuce Bishops, the crime informed the community that Florencia 13 "will kill you whether you are a gang member or not." Further, the individual gang members who participated in such a crime would have their individual reputations enhanced within their cliques.

### III.  Defense

Appellant Vasquez produced no evidence. Appellant Recarte presented testimony by his two older brothers, who denied that he belonged to a gang. Recarte's gang expert, Gregorio Estevane, testified that based on his investigation of appellant Recarte's background, he did not believe that Recarte was an active gang member at the time of the shooting. Given a hypothetical by defense counsel which incorporated facts mirroring defense evidence tending to show that appellant Recarte was not an active Florencia 13 member, and also incorporating the fact that such a person "happened to be driving a vehicle from which another gang member shoots two people," Estevane opined that a nongang motive was just as plausible as a gang motive "where [the driver] could have been used or duped."

6

**DISCUSSION**

**I.      Sufficiency of the Evidence to Support the Murder Convictions**

Appellants contend that the evidence is insufficient to support their murder convictions. In reviewing their contentions, we view the evidence in the light most favorable to the judgment, and presume in support of the judgment all inferences the jury could reasonably draw from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

*A.      Appellant Vasquez*

Appellant Vasquez, who was convicted of first degree murder in the killings of Hamblett and Wilson, contends simply that the evidence was insufficient to prove that he was the shooter or even present when the shooting occurred. He is incorrect.

The recorded pretrial statements of Alsovon Jenkins described the shooting, the route of the Thunderbird after the shooting, the stopping of the vehicle in the area of Vasquez's residence, the exiting of the passenger holding a firearm, and the passenger entering a house. Vasquez was very soon discovered at that location by Detective Keen, who was led there by a scent dog based on a scent sample taken from the Thunderbird. Three shell casings fired by the murder weapon were seized from the Thunderbird, two from the rear passenger floorboard, and one from the outside on a windshield wiper. They matched the 13 casings discovered at the scene.

Before Detective Keen arrived, Vasquez was present at his residence and told Marcos Rangel that "he" or "they" had shot three African Americans, and warned Rangel not to go outside because the police had blocked off the street. After his arrest and before being released, Rangel told another inmate in a recorded conversation that Vasquez was the shooter: the "fool [who] had shot them fools was [his] cousin," who was known as "Trucha" from "Jokers."

Finally, in Vasquez's recorded conversation with Recarte while in custody, Vasquez implicitly acknowledged that he was the shooter. Recarte asked Vasquez, "Did

7

you tell them that I told you to bust?" Vasquez first repeated the question, "That I told you to bust? . . . To shoot?" After thus clarifying that Recarte was asking whether Vaszuez had told detectives that Recarte had told him to shoot, Vasquez said, "Hell no . . . I'm like, damn. I don't even know him." Later, when Recarte told Vasquez, "We should've waited the other day. . . . We should've waited dawg," Vasquez again implicitly acknowledged his participation with Recarte in the killings: "I know, dude, we fucked up."

Taken as a whole, this evidence was more than sufficient for the jury to find that Vasquez was the one who fired 16 rounds at Hamblett and Wilson, killing them. It was thus sufficient to prove his guilt of first degree murder.

### B. *Appellant Recarte*

Appellant Recarte, who was convicted of second degree murder on an aiding and abetting theory, contends that the evidence failed to prove that he intentionally aided the shooter. The grouping of the 13 shell casings in close proximity at the scene suggested that the Thunderbird was either stopped or moving slowly when the passenger was shooting. This evidence alone was sufficient to support a jury finding that Recarte was intentionally aiding the shooter. Moreover, Recarte's recorded in-custody conversation with Vasquez acknowledged his knowing participation in the killings. He urged Vasquez not to tell detectives that he had told Vasquez to shoot, and he regretted being apprehended: "We should've waited the other day. . . . We should've waited dawg." The evidence was sufficient to prove that he intentionally aided Vasquez in the killings.

## II. Sufficiency of the Evidence to Support the Gang Allegation

Appellants raise several issues relating to the gang enhancement and gang evidence. None has merit.

8

A.      *Commission of Killings to Benefit Florencia 13*

Appellant Recarte contends that the evidence was insufficient to support the finding, as required by section 186.22, subdivision (b)(1), that the killings were "committed for the benefit of, at the direction of, or in association with any criminal street gang."  We disagree.

The evidence established that appellants Vasquez and Recarte belonged to Florencia 13.  In midday, they drove to the heart of territory claimed by a rival African American gang, the Nine Deuce Bishops, and targeted two African Americans walking on the street, at least one of whom belonged to the Nine Deuce Bishops.  Appellant Vasquez fired at them 16 times while appellant Recarte stopped or drove slowly.  The victims were shot from behind.  Appellants then drove off.  This evidence alone strongly suggested that appellants acted to enhance the reputation of their gang and their own reputations within the gang by killing suspected Nine Deuce members in Nine Deuce territory.

Regardless, the testimony of a prosecution gang expert, based on a hypothetical question rooted in the evidence of the particular case, is admissible to prove that a crime qualifies under section 186.22, subdivision (b)(1).  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)  In the present case, Detective Camarillo, the prosecution gang expert, testified in response to a hypothetical question mirroring the scenario shown by the evidence that such a shooting by Florencia 13 members "sends a strong message to the community . . . [,] the [Nine] Deuce Bishops . . . [and] other gangs," instilling fear, enhancing Florencia 13's reputation, and demonstrating that Florencia 13 "will kill you whether you are a gang member or not."  Further, the individual gang members who participated in such a crime would have their individual reputations enhanced within their cliques.  Additionally, in their recorded in-custody conversation, appellants referred to each other using the name of their gang, agreeing not to incriminate each other:  Vasquez said, "Say it, Florence, I'm Florence gang, nigger," to which Recarte replied, "Right."

On appeal, appellant Recarte suggests that in telling Marcos Rangel that the persons shot were "chongos," a derogatory term for African Americans, Vasquez was

9

ascribing a racial, not gang, motive to the killings. However, in context, the jury was free to infer that Vasquez used such a derogatory term not simply for racial reasons, but as an indication of disrespect for the Nine Deuce Bishops, an African American gang. In short, the evidence was sufficient to support the jury's finding that appellants acted for the benefit of their gang.

        B.      *Opinion in Response to a Hypothetical Question*

Appellant Vasquez contends that the trial court erred in permitting Detective Camarillo to testify, based on a hypothetical question mirroring the facts of the killings, that such a crime was committed to benefit Florencia 13. It appears that Vasquez's sole objection to the prosecutor's question was that it mentioned the precise location where the shooting occurred, thus transmuting Detective Camarillo's opinion into one involving not a hypothetical gang member, but Vasquez himself. But the fact that the prosecutor's question mentioned the location of the shooting was not improper. "It is required, not prohibited, that hypothetical questions [in gang cases] be based on the evidence. The questioner is not required to disguise the fact the questions are based on that evidence." (*Vang, supra,* 52 Cal.4th 1041.) Mentioning the location of the shooting did not convert Detective Camarillo's opinion into an improper one concerning Vasquez's personal mental state.

        C.      *"Primary Activities" of Florencia 13*

Appellant Recarte contends that the prosecution failed to prove the required element that one of Florencia 13's "primary activities" is the commission of one or more crimes enumerated in section 186.22, subdivision (e). (See *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.) However, Detective Camarillo, who in his 16-year career has had "hundreds, if not thousands" of contacts with Florencia 13 gang members, testified that "[s]ome of the primary activities [of Florencia 13] would be assaults, including those with firearms such as drive-by shootings, possession and distribution and sales of narcotics, robberies, . . . [and] murder . . . to name a few." All of these offenses listed by

10

Detective Camarillo qualify under section 186.22, subdivision (e). (See *id.*, subd. (e)(1)-(4), and (6).) Asked whether he had investigated those crimes involving Florencia 13, he responded that he had. He also testified to two specific cases involving qualifying crimes committed by Florencia 13 members (supported by records of the convictions), one involving member Richard Hernandez convicted of, *inter alia*, felon in possession of a firearm committed in March 2007, the other involving member Ernesto Orozco for, *inter alia*, assault on a peace officer with a rifle committed in January 2007.

This testimony, taken as a whole, was certainly sufficient to meet the "primary activities" requirement. (*Gardeley, supra,* 14 Cal.4th at p. 620.) Appellant Recarte argues, however, that Detective Camarillo's testimony was deficient because it contained no specifics as to the circumstances of Florencia 13's qualifying crimes, or where, when, or how Detective Camarillo learned of them. Of course, such details are not necessary to establish the "primary activities" element, but in any event Detective Camarillo testified that he had investigated such qualifying crimes committed by Florencia 13, thereby establishing his own personal knowledge.

### D. *Testimony About Hernandez's and Orozco's Gang Membership*

In a related contention, appellant Vasquez contends that the trial court erred in permitting Detective Camarillo to testify that Richard Hernandez and Ernesto Orozco, the two persons whom he testified committed qualifying crimes for proof that Florencia 13 engages in a "pattern of criminal gang activity" (§ 186.22, subd. (e)),[2] belonged to Florencia 13. According to Vasquez, the testimony was based on inadmissible hearsay.

---

[2] Section 186.22, subdivision (e) provides in relevant part: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."

11

Because Vasquez fails to cite to the record showing that an objection was made in the trial court, and we find none, the issue is forfeited. (*People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1434.) In any event, Detective Camarillo testified that he had had contacts with Hernandez and arrested him and that he had had contacts with Orozco. Thus, it appears that his testimony about their gang membership was based on his personal knowledge of that membership.

### E. *Testimony About Gang Members' Habits and Mental Processes*

Appellant Recarte contends that Detective Camarillo exceeded his expertise in testifying that: (1) gang members tend to commit driveby shootings with other trusted gang members; (2) witnesses in gang crimes sometimes recant prior statements out of fear of retaliation; (3) for their own safety, gang members are aware of rival gang's territory; and (4) it is common for gang members to borrow another gang member's car to commit crimes, because it may be too risky to use a stolen vehicle. Recarte contends that such testimony was inadmissible speculation. However, expert testimony on "the culture and habits of criminal street gangs," including gang sociology and psychology, is a proper subject of expert opinion. (*Gardeley, supra,* 14 Cal.4th at 617.) Nothing in the testimony referred to by Recarte is unusual in gang cases, and the testimony falls within the realm of proper expert opinion testimony.

### F. *Map of Gang Territories*

Without citation to case authority or reference to the record, appellant Vasquez contends that because Detective Camarillo testified that the Nine Deuce Bishops and Florencia 13 shared overlapping areas and that gang boundaries frequently changed, the trial court erred under Evidence Code section 352 in admitting a map that depicted fixed boundaries for the territories claimed by the two gangs. However, nothing about the map was misleading. Detective Camarillo testified that the map depicted the general area claimed by Florencia 13 as of August 2008, and that the location of the shooting depicted on the map was in the heart of Nine Deuce Bishop's territory. The map was simply a

12

proper demonstrative exhibit used to illustrate Detective Camarillo's testimony. The trial court did not abuse its discretion in admitting it.

### III.     Refusal to Allow Defense Gang Expert to Hear Camarillo's Testimony

Counsel for Recarte requested that Estevane be permitted to be present when the prosecution's gang expert testified, to assist defense counsel in cross-examination. The trial court sustained the People's objection and refused the request, noting however that it would give defense counsel time to confer with his expert witness after the prosecution's gang witness testified.

Without citation to any legal authority, Recarte argues that the trial court erred by refusing to allow his gang expert, Estevane, to be present in the courtroom to hear the prosecution's gang expert's testimony during trial. He contends this ruling deprived Recarte of his constitutional right to prepare and present a defense. Recarte asserts that the gang evidence played "the major role in proving Recarte's intent to aid and abet Vasquez." Recarte argues that if Estevane had been able to hear Camarillo's testimony, Estevane would have been able to assist the defense by testifying more precisely and more comprehensively. More specifically, he would have challenged Camarillo's testimony regarding (1) Camarillo's qualifications as a gang expert, (2) gang recruiting, (3) whether gang members hold jobs, (4) driveby shootings, (5) validation of gang crimes, (6) monikers, (7) Recarte's gang affiliation, and (8) whether the crime here was committed for gang purposes. We conclude the trial court did not abuse its discretion in denying the defense request.

The exclusion of witnesses from the courtroom is a matter within the trial court's discretion. (See *People v. Valdez* (1986) 177 Cal.App.3d 680, 687.) Evidence Code section 777 provides in pertinent part that "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." At trial, defense counsel requested that Estevane be present in order to assist with cross-examination. He offered no further explanation or showing of good cause to make an exception to the witness exclusion order the trial court had already

13

made. On appeal, Recarte now contends that Estevane's presence during Camarillo's testimony was necessary so Estevane could more effectively counter Camarillo's testimony. However, while he details in what respects Estevane's testimony might have been more effective, he fails to demonstrate why Estevane needed to be present to hear Camarillo's testimony. Defense counsel was permitted time to meet with Estevane before he testified and presumably shared his notes regarding Camarillo's testimony. There simply is no showing that the trial court abused its discretion when it excluded Estevane from the courtroom during Camarillo's testimony. This case was not unique, the testimony Camarillo gave was not technical, and Estevane was not prevented in any way from challenging Camarillo's testimony as Recarte now argues it should have been challenged.

## IV. Ineffective Assistance of Counsel by Failing to Adequately Present a Defense Gang Expert

Recarte next argues that defense counsel failed to ask Estevane his opinion about whether the shooting, given the factual circumstances under which it occurred, was for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. According to Recarte, if counsel had asked this "critical hypothetical," Estevane would have testified the perpetrators' actions were not for the benefit of the criminal street gang. In a declaration submitted with Recarte's motion for new trial, Estevane stated that the Mexican Mafia had issued an edict prohibiting all Southern California Latino gang members from performing driveby shootings, as they interfered with the Mexican Mafia's primary goal of making money from selling drugs and other illegal activities. In Estevane's opinion, the shooter who killed Wilson and Hamblett acted spontaneously, without considering the Florencia 13 gang or the personal danger they would find themselves in from the Mexican Mafia.

We conclude that, even if we assume without deciding that defense counsel was ineffective, no prejudice resulted from his failure to ask the specific hypothetical question

14

Recarte now contends was essential. (See *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 [to prevail on claim of ineffective assistance of counsel, defendant must establish counsel's representation fell below objective standard of reasonableness *and* there is a reasonable probability that but for counsel's deficient performance the result of trial would have been different].) First, the evidence of gang motive, though circumstantial, was very strong: two Florencia members drove to rival territory during the middle of the day, found suspected African American gang members, shot at them 16 times from behind while driving very slowly or at a full stop, and then drove away. The very circumstances of the crime strongly suggest the murders were committed for the benefit of a gang.

Furthermore, trial counsel did in fact elicit evidence that there was no gang motive for the killing. Specifically, at trial Estevane testified that as of 1990 the Mexican Mafia controlled Southern California Latino gangs, including Florencia 13, and ordered it to cooperate with its rival Latino gangs. One of their primary edicts was that there would not be any more driveby shootings as they interfered with the gang's money-making activities. Counsel asked, "Given that then, are drive-by shootings necessarily the types of offenses that are done to further the goals of criminal street gangs given this edict from the Mexican Mafia?" Estevane answered, "Well, no." Defense counsel elicited similar testimony from the prosecution's expert, that Florencia 13 was controlled by the Mexican Mafia, which prohibited driveby shootings in the 1990's, and that if a gang member found himself in state prison he was subject to being disciplined by the Mexican Mafia. The essential attribute of the shooting was that it was a driveby, and thus Estevane in essence opined that a member of Florencia 13 committing a driveby shooting would not be doing so for the benefit of his gang.

Finally, the purported expert opinion that Recarte contends should have been elicited was internally inconsistent: in support of the new trial motion, the expert opined on the one hand that "the shooter who killed two men at 88th and Bandera acted spontaneously," without considering gang consequences; yet on the other hand, the expert opined that the shooter acted "out of racial hatred toward the black men," which is

15

hardly spontaneous given that the hypothetical gang members drove into the territory of a rival African American gang. Given the evidence that was produced and the internal inconsistency of the opinion it is contended should have been elicited, as well as the strength of the gang motive evidence, it is not reasonably probable that had counsel elicited that opinion the result of the trial would have been different.

### V.      Lack of Foundation for Dog Tracking Evidence

Vasquez argues that the trial court erred by admitting testimony regarding dog tracking because whether Edward Hamm was qualified by training and experience to use the dog to trail suspects was not established, and the particular dog's reliability also was not established. We disagree.

In *People v. Malgren* (1983) 139 Cal.App.3d 234 (*Malgren*), the court stated that in each case the proponent of dog tracking evidence must establish the dog's ability and reliability, and the proper foundation must also include evidence that the circumstances of the tracking make it probable that the person tracked was the guilty party. The following must be shown before dog trailing evidence is admissible: (1) the dog's handler was qualified by training and experience to use the dog; (2) the dog has been found to be reliable in tracking humans; (3) the dog was placed on the track where circumstances indicated the guilty party to have been; and (4) the trail had not become stale or contaminated. (*Id.* at p. 238, disapproved on another ground in *People v. Jones* (1991) 53 Cal.3d 1115, 1145-1146.)

Specifically, Vasquez argues on appeal that Hamm (1) did not state by whom he was trained, other than to say he was trained for one year by experienced dog handlers, and he did not state their qualifications to teach; (2) he did not state from whom he received certification; and (3) he did not state whether the dog was tested to see how well he tracked humans or whether the dog was found to be reliable.

We conclude that the evidence regarding Hamm's qualifications and the dog's reliability was adequate to meet the requirements set forth in *Malgren*, *supra*, 139 Cal.App.3d at page 238. Hamm testified that he acquired his first scent dog and began

16

his training in 1988 under the direct supervision of experienced handlers from two organizations that provide volunteers and dogs to help in search-and-rescue operations: the Los Angeles Search Dogs, an organization within the Sheriff's Department, and the California Rescue Dog Association, a statewide organization. After training for one year, Hamm was certified to start working with his first dog in search-and-rescue operations in Los Angeles County and statewide. Beginning in early 1996 he began using his dogs to do investigative work, at the request of the Los Angeles County Sheriff's homicide bureau investigators. At the time of trial Hamm had assisted law enforcement agencies more than 2,000 times. He was trained in the use of a device called a scent transfer unit by one of the inventors and developers of the unit, as well as by the Sheriff's homicide bureau investigators. Hamm himself taught classes regarding canine scent trailing. Hamm's qualifications were undoubtedly satisfactory.

Hamm testified that it takes between one and two years to train a dog as a scent dog. The readiness of Hamm's dogs is sometimes evaluated using a formal certification procedure, although in noncriminal cases the dog may be proven reliable by less formal means. The dog involved in the search for Vasquez had been used by Hamm in investigations about 350 times beginning in 2006 until the time of trial. At the time of the search for Vasquez the dog had been used about 80 to 90 times to conduct searches. On the dog's first search, when other search methods had proved ineffective, he successfully located a runaway teenager in the desert three-quarters of a mile away. It is readily inferable that the dog had proved himself useful and reliable in trailing human scent; otherwise he would not have continued to be used for that purpose.

## VI. Prosecutorial Misconduct

"'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . .' [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such

unfairness as to make the conviction a denial of due process. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643; *People v. Hill* (1998) 17 Cal.4th 800, 819.) The prosecutor generally is given wide latitude in presenting closing argument, and may provide fair comment on the evidence, state matters of common knowledge or experience, and argue strenuously for a particular interpretation or verdict. (See *People v. Hill*, *supra*, at p. 819.) Misconduct by a prosecutor that does not render a criminal trial fundamentally unfair is error under state law "if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution." (*People v. Green* (1980) 27 Cal.3d 1, 34, abrogated on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225.)

Defense counsel did not object to any of the statements appellants now claim constituted misconduct, and appellants do not argue in their briefs that an admonition would not have cured any prejudice. While we do not find there was misconduct, we are satisfied that an admonition by the court in each case would have cured any perceived harm. Accordingly, the claims of prosecutorial misconduct are not cognizable on appeal. (*People v. Smith* (2003) 30 Cal.4th 581, 633.) We reach the merits, however, in order to demonstrate counsel was not ineffective for failing to object.

## A. *Reasonable Doubt*

Appellants contend that the prosecutor twice misstated the law regarding reasonable doubt during closing argument. The prosecutor stated as follows: "And what is reasonable doubt? In its simplest terms, it simply means this. Is there any other reasonable explanation for all of the evidence that you have in front of you that you will be supplied with in the jury room and also have testimony of if you so choose? Is there any other reasonable explanation for all of that?" He later said, "Well, ladies and gentlemen, it's a standard used in every court throughout the United States in criminal cases. There is no scale. They can't show you one standard is here, another standard is here. It's everything together convincing that there is no other reasonable explanation when you look at it as a whole." The prosecutor made the first comment quoted above in the context of addressing a statement made by the defense gang expert to the effect that all he had to do was show a small amount of doubt, and that did not have to be 100 percent accurate, to establish reasonable doubt.

Appellants contend that the quoted remarks misstated the law in that reasonable doubt exists if the jury does not accept as true or reasonably doubts the facts the People have offered as evidence; the jury need not look to what inferences can be drawn from the facts they disbelieve or whether any other reasonable inferences exist. The argument that the prosecutor misstated the reasonable doubt standard is meritless. The prosecutor properly urged the jury to examine the prosecution's case as a whole and determine whether there was any reasonable explanation other than that defendants committed two murders to benefit their gang. The prosecutor had no duty to tell the jurors that they were free to disregard evidence they disbelieved or refuse to draw inferences they deemed unreasonable. That point was obvious from the instructions. Nothing in the prosecutor's argument could have remotely misled the jury as to the standard of proof beyond a reasonable doubt.

In any event, the trial court instructed the jury regarding the reasonable doubt standard and that it had to accept and follow the law as stated by the court. It further instructed the jury that if anything concerning the law said by an attorney during

19

argument conflicted with the court's instructions, the jury must follow the instructions. Under these circumstances it is clear that defendant suffered no prejudice from the remarks of the prosecutor.

        *B.      Using "We Know" and Vouching for Prosecution Witnesses' Credibility*

Recarte contends that the prosecutor committed misconduct by improperly expressing his personal opinion and vouching for his witnesses' credibility by repeatedly using the words, "we know." We disagree.

Recarte recounts in his brief on appeal numerous times when the prosecutor used the phrase, "we know," and now assigns the use of that phrase as error. The prosecutor began his closing argument by stating that appellants together executed Hamblett and Wilson. He continued, "How do we know this is what happened? And the defendants, why they are responsible for it?" The prosecutor then proceeded to review the evidence presented at trial, including from the eyewitness, Jenkins, who saw the shots fired, followed the car, and described to the 911 operator where the car went and where Vasquez exited the car. He continued by noting the jury saw Jenkins testify. "And what did you see? You saw a very scared man who couldn't even admit to you that he didn't want to be involved, that he wasn't concerned for the safety of his family, and that he wasn't worried about his son who may be in that area at some point where he has family. But we know differently."

The prosecutor then focused on Vasquez, "who got out of the car as soon as he got a chance by his house, how do we know he is involved? How do we know he is responsible?" The prosecutor then pointed to Jenkins's testimony and the evidence that the scent dog tracked Vasquez to his home. The prosecutor also recalled the appellants' conversation, recorded while they were incarcerated, in which Recarte asked Vasquez if he "t[old] them I told you to bust." The prosecutor noted that "thanks to him, we know what that means[,] to shoot." He remarked, "from Detective Camarillo, we know why this all happened," i.e., because appellants wanted to benefit themselves and their gang. He later said, "Now we know that Florencia is a criminal street gang under the law."

Similarly, in discussing the elements required to prove the criminal street gang special circumstance, he said appellants "have to be active members of Florencia 13 which we know they were by their acts by what they did, by what they said to each other." In responding to Recarte's assertion he did not know what was going to happen when he was driving, the prosecutor said, "But what do we know? We know that gang members are well aware of where their territory is, where their rival's territory is." Regarding the location where shells were found, the prosecutor said, "We know that that gun was loaded with 16 rounds. We know that defendant Recarte was with another active gang member. We know that that T-bird had to be at a complete stop [or] moving very slowly for 13 of the 16 rounds to end up where they did right next to each other."

Commenting on Estevane's testimony that the best indicator of whether a person is in a gang is to ask his family, the prosecutor stated, "As long as I hide it from my family, from my friends, I am not a gang member. That's what Mr. Estevane wants you to believe, and we know that's not right." Further, as to Estevane's testimony that this was not a gang-related crime, he said, "That is not the case. We know that is not the case. If I don't yell out the gang name after or during the crime, it's not a gang crime. Well, . . . maybe the defendants did. But unfortunately, the two people who can tell us about it are dead. So what Mr. Estevane is trying to say is that if the defendants get away with it, if no one hears it, it didn't happen. And we know that's not the case as well." The prosecutor then asked, "what more than anything else do we know about Greg[orio] Estevane?" and then remarked on Estevane's comment that he only needed to show a small amount of doubt and that it did not have to be completely accurate. Recarte also points to the prosecutor's statement, "So how do we know both of the defendants are guilty? It's because of everything, ladies and gentlemen, when you put it [all together], when you consider everything against each other, they corroborate each other. They substantiate each other." In concluding, the prosecutor stated, "I have the burden of proving this case beyond a reasonable doubt. I accepted it. I took it on. And that weight is off my shoulders. I have proven this case beyond a reasonable doubt."

21

The prosecutor did not place the prestige of the government behind a witness by giving personal assurances of the witness's veracity, or suggesting that information not presented to the jury supported the witness's testimony. (See *United States v. Necoechea* (9th Cir. 1993) 986 F.2d 1273, 1276.) The use of "we know" in the prosecutor's closing argument "is only improper when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility. [Citation.]" (*United States v. Bentley* (8th Cir. 2009) 561 F.3d 803, 812.) Use of "we know" is not improper when used as the prosecutor did here to refer to the People's evidence and to summarize the People's case. (*Ibid.*; see *United States v. Younger* (9th Cir. 2005) 398 F.3d 1179, 1191 ["we know" not improper when used to "marshal evidence actually admitted at trial and reasonable inferences from that evidence"].) Use of "we know" is not plain error if it is used "to refer the jury to the government's evidence and to summarize the government's case against the defendants." (*United States v. Lahey* (7th Cir. 1995) 55 F.3d 1289, 1299.) In each and every instance of claimed misconduct here, the prosecutor was referring to evidence presented to the jury and reasonable inferences that could be drawn from the evidence. Accordingly, we find no prosecutorial misconduct occurred.

### C.     *Commenting on Recarte's Right to Remain Silent*

"Under the rule in *Griffin* [*v. California* (1965) 380 U.S. 609], error is committed whenever the prosecutor or the court comments, either directly or indirectly, upon defendant's failure to testify in his [or her] defense." (*People v. Medina* (1995) 11 Cal.4th 694, 755.)  Here, the prosecutor stated that "the defendants through their attorneys" would "have the opportunity to speak to all of you," would ask the jurors to speculate, and would argue that the case was not proven beyond a reasonable doubt. Without any analysis, appellant Recarte contends that by prefacing these three remarks with the words, "the defendants through their attorneys," the prosecutor was commenting on appellant's right not to testify, in violation of *Griffin*.  However, there is no merit to the argument.  The prosecutor was merely saying that the defense attorneys would be

22

making arguments on behalf of the appellants. Under no reasonable construction can the prosecutor's remarks be interpreted as comments on appellants' failure to testify.

## VII. Resentencing Because Juvenile Offenders Must Not Be Sentenced to De Facto Life Sentences

Appellant Recarte was 17 years old when the murders were committed. The trial court sentenced him to an indeterminate term of 40 years to life. Recarte contends that this sentence constitutes a de facto life without parole sentence and thus constitutes cruel or unusual punishment under the Eighth Amendment.

In *People v. Caballero* (2012) 55 Cal.4th 262, 268, the California Supreme Court, relying on the reasoning of *Graham v. Florida* (2010) 560 U.S. 48 and *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455], held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." The court declined to decide whether such a sentence for a juvenile convicted of homicide would violate the Eighth Amendment. (*Id.* at 268, fn. 4.) But "subsequent appellate decisions have held that an expansive interpretation of what constitutes a life sentence should also apply in such cases." (*People v. Franklin* (2014) 224 Cal.App.4th 296, 303, citing *People v. Thomas* (2012) 211 Cal.App.4th 987, 1014-1016, and *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.)

We conclude that appellant Recarte's sentence does not violate the Eighth Amendment. First, it is undisputed that Recarte will be eligible for parole at age 57, well within his natural life expectancy of 72.1 years.[3] Thus, "by no stretch of the imagination

---

[3]      Recarte, who was 22 years old at the time of sentencing, received credit for 1,928 days in custody, more than five years. Thus, he will be eligible for parole in 35 years after sentencing, when he will be 57 years old. Recarte apparently concedes that his general life expectancy is 72.1 years, but argues that "he might only have, at best, fifteen years left" after his initial parole eligibility. Recarte's argument notwithstanding, a 15-year time span certainly provides a meaningful opportunity to demonstrate his

can this case be called a 'functional' or 'de facto' [life without the possibility of parole (LWOP)], and therefore neither *Miller*, *Graham*, nor *Caballero* apply." (*People v. Perez* (2013) 214 Cal.App.4th 49, 57-58 [no de facto LWOP where defendant eligible for parole at age 47]; cf. *People v. Solis* (2014) 224 Cal.App.4th 727, 734 [declaring parole eligibility at age 68, with a life expectancy of age 72, failed to provide meaningful opportunity for parole].)

Second, assuming for the sake of argument that Recarte's sentence is the functional equivalent of a life without parole sentence, in response to *Miller, Graham,* and *Caballero,* the Legislature enacted section 3051, which provides juvenile offenders with a "meaningful opportunity to obtain release" (§ 3051, subd. (e)) through a "youth offender parole hearing" (§ 3051, subd. (a)(1)). The Courts of Appeal have been split as to whether the procedures provided by section 3051 are sufficient to comply with the mandate of *Miller*, *Graham*, and *Caballero,* and the issue is currently pending before the California Supreme Court in, among others, *In re Alatriste* (review granted Feb. 19, 2014, S214652) and *People v. Martin* (review granted Mar. 26, 2014, S216139). Without belaboring the point, we agree with the analysis of those decisions that holds that, in light of section 3051, "because defendant no longer faces the functional equivalent of life without the possibility of parole for the crime he committed as a juvenile, he is not entitled to a new sentencing hearing under *Miller* or remand under *Caballero* to determine the time for parole eligibility." (*Franklin, supra,* 224 Cal.App.4th at p. 307; but see *Solis, supra,* 224 Cal.App.4th at p. 736 [§ 3051 provides "a '"safety net"' as opposed to a cure-all for juvenile sentences that violate the Eighth Amendment"].) Thus, even if Recarte's sentence were the functional equivalent of a life without parole sentence (it is not), the procedures of section 3051 comply with Eighth Amendment requirements.

---

suitability for parole. Recarte argues that studies show that former prison inmates have shorter life expectancies than unincarcerated persons. We find such statistics far too speculative to suggest that Recarte's parole eligibility at age 57 fails to provide a reasonable opportunity for him to demonstrate within his life expectancy that he is entitled to parole.

Finally, we reject Recarte's contention that the trial court failed to consider his age and related factors in exercising its discretion in sentencing him. The court stated it had reviewed and considered the motion filed by Recarte seeking a reduction of his sentence as being unconstitutionally cruel and unusual punishment. The court also considered the People's sentencing memorandum and its attachments. The court was aware that Recarte was one month shy of turning 18 at the time the crimes were committed. Defense counsel argued that juveniles like Recarte are immature, make rash decisions, and are easily influenced by others. She argued the crimes were extremely out of character for Recarte because he had no significant criminal record, and that he came from a successful, supportive family. The court listened to statements from his family members as well.

In stating its choice to run the two indeterminate sentences consecutively, the trial court did not enumerate every factor it considered. A trial court is not required to state its reasons for ordering one indeterminate term to run consecutively to another indeterminate term. Section 1170, subdivision (c), which requires the trial court to "state the reasons for its sentence choice on the record at the time of sentencing," applies only to *determinate* sentences imposed pursuant to section 1170. The California Rules of Court state that the sentencing rules which require a statement of reasons "for those matters for which reasons are required by law" (rule 4.433(c)(5)) "apply only to criminal cases in which the defendant is convicted of one or more offenses punishable as a felony by a determinate sentence imposed under Penal Code part 2, title 7, chapter 4.5 (commencing with section 1170)" (rule 4.403). "Accordingly, a trial court may impose consecutive indeterminate terms without any statement of reasons whatsoever." (*People v. Arviso* (1988) 201 Cal.App.3d 1055, 1058 [discussing former rules 403 and 433(c)(5)]; superseded by rule on other grounds as stated in *People v. Calhoun* (2007) 40 Cal.4th 398.) Although in deciding to run Recarte's indeterminate terms consecutively the trial court did not specifically state that it took into account each factor related to his youth, we presume that it considered all of the factors presented to it. (See Cal. Rules of Court, rule 4.409 [even in the context of determinate sentencing in which the court must state

25

reasons for sentencing choice, "[r]elevant criteria enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"].)  Thus, remanding the matter with directions to the court to exercise its discretion is not required here in any event.

**DISPOSITION**

The judgments of conviction are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.*

We concur:

EPSTEIN, P. J.

MANELLA, J.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26